THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JANET CUMMINGS, EMILIA MARTINEZ
VICTOR PIERINI and LAUREL RINGUIS                          PLAINTIFFS

VS.
                    CASE NO. 14-CV-2090 PKH

BOST, INC., d/b/a BOST                                      DEFENDANT

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' CLAIMS UNDER FAIR LABOR STANDARDS ACT AND ARKANSAS MINIMUM WAGE ACT**

## I. Introduction

Plaintiffs' claims fall under the Companionship Services Exemption ("Companionship Exemption") to the Fair Labor Standards Act ("FLSA"). The Companionship Exemption undisputedly applies to each living situation briefed in this case. The homes at which clients of Bost, Inc. d/b/a Bost ("Bost") lived and received companionship services from Residential Habilitation Aides ("RHA"s) were and are "private homes" -- not boarding homes or lodging houses operated by Bost as a business enterprise open to the public. Bost respectfully requests this Court dismiss each Plaintiff's claims for alleged violations of the Fair Labor Standard Act and the Arkansas Minimum Wage Act, because Bost's employees, as a matter of law, are exempt from overtime pay.

## II. Applicable Law

### A. Companionship Exemption Overview

Plaintiffs were and are exempt under the FLSA's Companionship Exemption. *See* 29 U.S.C. § 213(a)(15); 29 C.F.R. § 552.6. To fall within the Companionship Exemption, an

employee must first be classified as a "domestic services employee."  *See Terwilliger v. Home of Hope, Inc.*, 21 F. Supp. 2d 1294, 1299, 1998 U.S. Dist. LEXIS 15103, *9 (N.D. Okla. 2998).  The determinative factor in domestic services employment is that the employment must occur in or about a "private home."  *See id.*   The applicable statutory exemption and regulations related to a "private home" state, in pertinent part:

> "The [minimum wage and overtime] provisions of [the Act] <u>shall not</u> apply with respect to-- . . .
>
> (15) . . . any employee employed in domestic service employment to provide <u>companionship services</u> for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary [of Labor]); . . . "

29 U.S.C. § 213(a)(15)(emphasis supplied).

> "[T]he term "domestic service employment" refers to services of a household nature performed by an employee <u>in or about a private home</u> (permanent or temporary) of the person by whom he or she is employed."[1]

29 C.F.R. § 552.3 (emphasis added).

The regulations expound upon what is considered a "private home" and specifically note that a "private home" could be fixed or temporary.  The regulation states, in pertinent part:

> "The domestic service must be performed in or about the private home of the employer <u>whether that home is a fixed place of abode or a temporary dwelling</u> as in the case of an individual or family traveling on vacation.  A separate and distinct dwelling maintained by an individual or a family in <u>an apartment house, condominium or hotel may constitute a private home</u>."

29 C.F.R. § 552.101(a)(emphasis added).

---

[1]  In the newest version of the C.F.R. (active as of November 12, 2015) it states: "The term domestic service employment means services of a household nature performed by an employee in or about a private home (permanent or temporary)."  29 C.F.R. § 552.3.  For purposes of this Brief, the application of the new C.F.R. versus the old C.F.R. does not impact the fact that Plaintiff's homes were "private" homes.

**B.  *Fezard v. UCP* – Private Homes**

Previously, neither the Supreme Court nor the Eighth Circuit had interpreted the meaning of the term "private home" under 29 C.R.R. § 552.3.  *See Solis v. FirstCall Staffing Solutions, Inc.*, 2009 U.S. Dist. LEXIS 107543, *7 (W.D. Mo. 2009).  However, the Eighth Circuit recently issued an opinion in which it expressly ruled that the Companionship Exemption applied in fact patterns that are virtually identical to the situations at hand.  The Eighth Circuit correctly determined that the employer-employee-client living situations were "private homes." *See Fezard, et al v. United Cerebral Palsy of Central Arkansas,* 2016 U.S. App. LEXIS 27 (8th Cir. 2016).  In *Fezard*, United Cerebral Palsy of Central Arkansas, Inc. ("UCP") clients lived with UCP employees who "opened their homes and invited their clients to live as roommates or surrogate family members."  *Id.* at *2.  UCP did not dictate that its employees and clients live together; did not dictate that clients move into employees' homes when they became UPC clients; and did not require them to move out when they stopped receiving UCP services.  *Id.* at *2 –*3.  UCP did not control the living arrangements; those details were decided upon by the client and employee acting as an independent third party – a relationship over which UCP exerted no control.  *Id.* at *3.

The Eighth Circuit correctly noted that in all prior cases regarding the Companionship Exemption, the relevant comparison was between the employer and the client, or in other words, a comparison between the employer's commercial care facility or the client's traditional single-family residence.  *Id.* at *9.  The question of whether a home is a "private home" revolves around the question:   Does the employer own or control the home?  *Id.*  It is the employer's control of the living arrangement that is important.  *Id.* at *10.

In *Fezard*, just as in the case at bar, every client lived in a dwelling that was private in relation to the employer, UCP.  *Id.* at *10.  UCP did not exert control over the room in which a client lived, the rent paid, or any other condition of the living arrangement.  *Id.*  While UCP may have acted to facilitate a connection between a client and caregiver, its involvement was limited to making the connection.  *Id.*  UCP had no ability to evict any client if the client ceased to use UCP's services.  *Id.*  The same is true of every living situation at issue in this case.

### C.  Companionship Exemption – Other Jurisdictions

The Tenth Circuit has interpreted "private home" and noted that Department of Labor's definition of "private home" exists along a continuum, at one end of which is a traditional single family home in which a single family resides, and at the other end of which is an institution primarily engaged in the care of the sick, the aged, the mentally ill or a boarding house used for business or commercial purposes.  *See Fezard* at * 7 (*quoting Welding v. Bios Corp.*, 353 F.3d 1214, 1217 (10th Cir. 2004).  The key inquiries involve determining who has ultimate management control of the living unit and deciding whether the living unit is maintained primarily to facilitate the provision of assistive services.  *Id.*

In 1998, the *Terwillger* court relied on a four part fact-specific test to determine whether a dwelling was a private home.  *See Terwilleger v. Home of Hope, Inc.*, 21 F. Supp. 2d at 1299.  Those factors were:  1) the facility's source of funding; 2) access to the facility by the general public; 3) whether the facility was organized for profit or is a nonprofit organization; and 4) the size of the organization.  *Id.*

A few years later, the *Welding* court identified six non-exclusive factors in an effort to provide a framework for future courts in assessing whether a residence was a "private home." The factors included: 1) when the client began living in the home; 2) whether the client had an

ownership or leasehold interest in the home; 3) who maintained the home; 4) whether the client could remain in the home absent contracting with the services provider; 5) the cost/value of the services relative to the total cost to maintain the home; and 6) whether the service provider used any part of the home for provider's own business. *Welding*, 353 F.3d at 1220.

In addition to the *Welding* factors, the *Solis* court looked to additional factors in making the determination of whether the homes in which a client lived were "private homes." *Solis* at *16. In *Solis*, the district court in Missouri found that the apartments at issue were not "private homes," but the distinctions between the apartments in the *Solis* case and the homes in the instant case are numerous. Some of the *Welding* factors, plus additional factors, played significantly into the court's decision in finding that the apartments were not private homes. For instance, the payment of rent and utilities at the apartments was "not what one typically would find with a private residence." *Solis* at *11 – *12. The service provider, FirstCall, had set up one bank account in the name of FirstCall into which the state deposited the clients' disability and SSI payments. *Id.* FirstCall withdrew and paid the clients' rent monies with no involvement from the clients. *Id.* The KCRC (equivalent to DDS) would also determine how much spending money each client could have, and that money would be deposited in the FirstCall account, and FirstCall could withdraw the money. *Id.* Also, FirstCall employees had keys to the clients' apartments. *Id.* at *16. Finally, there were even requirements mandating that all clients live in the apartments, and that all clients have a roommate and that all roommates use the same service provider. *Id.*

Ultimately, the district court found that the apartments were being maintained primarily to facilitate the provision of assistive services, and the clients' freedom to choose their own living situation was extremely curtailed by DDS rules. *Id. at* *4 – * 5. In the pages to come, this brief

will point out the stark differences between the apartments/arrangements discussed in *Solis* and the private homes of Bost clients involved in the case at bar.

In many cases addressing the Companionship Exemption, plaintiffs take issue with the "private home" at which services are rendered.  Normally, plaintiffs argue the homes were truly owned and operated by Defendant, thus not "private homes."  *See Linn v. Developmental Services of Tulsa, Inc.* at *9 (where Plaintiff sought to avoid the exemption by claiming he did not work at a private home but rather at Defendant's place of business).  In the case at bar, however, Plaintiffs have taken the extremely novel position – a position that has now been rejected by the Eighth Circuit – that they are entitled to overtime pay under the FLSA because the services they provided were provided in or about *their own* private homes.  There is no dispute whatsoever that Bost had/has no ownership or management of any of the private homes in question.  As a result, Plaintiffs' entire argument for the misapplication of the Companionship Exemption hinges upon the faulty – and now officially, legally incorrect – premise that a Bost client could not claim a dwelling as their private home if the RHA claimed it was their private home, too.

### D.  General Household Work Exception under C.F.R. 552.6

Once the "private home" requirement is established, in order to qualify under the Companionship Exemption, the services rendered to the client must be considered "companionship services."  According to the regulations, companionship is defined as follows:

> As used in section 13(a)(15) of the Act, the term *companionship services* shall mean those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work: *Provided, however,* that such work is incidental, *i.e.,* does not exceed 20 percent of the total weekly hours worked.

29 C.F.R. § 552.6 (emphasis in original).

The regulation cited above contains an exception to the Companionship Exemption where general household work exceeds twenty percent (20%) of the total weekly hours worked.[2] When the household services exception applies, the exemption cannot be used, and the general FLSA overtime rules govern. *See Linn v. Developmental Services of Tulsa, Inc.*, 891 F. Sup. 574, 578, 1995 U.S. Dist. LEXIS 9930, * 8 (N.D. Okla. 1995).

District Courts have examined what chores qualify for the general household services exception versus household work related to patient care. *See Anglin v. Maxim Healthcare Services*, No. 6:08-cv-689, 2009 U.S. Dist. LEXIS 70155, *4 (M.D. Fla. Aug. 11, 2009)(evaluated decisions of other courts regarding what type of work qualifies as "general household" works as distinguished from work related to patient care); *Terwilliger v. Home of Hope*, 42 F. Supp. 2d 1231, 1254 (N.D. Okla. 1999)(test is whether a task is necessary for the care of the client, and if so, the task cannot be "general household" work unrelated to the client, and does not count toward the twenty percent exception); *Toth v. Green River Regional Mental Health/Mental Retardation Board, Inc.*, 753 F. Supp. 216, 217-18 (W.D. Ky. 1989), *aff'd sub nom. Hengesback v. Green River Regional Mental Health/Mental Retardation Board, Inc.*, 985 F.2d 560 (6th Cir. 1993)(plaintiffs could not avail themselves of the "general household" work exception where

---

[2] It should be noted that the Department of Labor unilaterally changed C.F.R. § 552.6 in January of 2015, however, the Final Rule change was not implemented until November 12, 2015, thirty (30) days after the Mandate was issued in *Home Care Association of America, et al v. Weil*, the case in which the district court was reversed after having stayed the implementation of the Final Rule. *See Home Care Association of America, et al v. Weil*, No. 15-5108 (D.C. Cir. Oct. 13, 2015)(Mandate). As of November 14, 2015, all Bost RHAs were paid hourly and not under the Companionship Exemption. (Exhibit 13, Affidavit of Laura Golden). None of the plaintiffs herein were paid via daily rates after the new regulations became effective. Therefore, plaintiffs' claims brought in this lawsuit are appropriately analyzed under the older 29 C.F.R. § 552.6 cited in the Brief above which had been in place from 1975 until November 12, 2015.

they failed to present specific facts sufficient enough to support their argument that they spent twenty percent of their time doing "general household" work).

In *Anglin*, plaintiff presented evidence that she regularly spent more than twenty percent of her time performing general household work, and other work unrelated to the care of her patients, **at the patients' homes**.  2009 U.S. Dist. LEXIS 70155, *13.  She testified that when there was "downtime", she would perform tasks for others living in the household, including: daily laundry; daily cooking; daily washing dishes; heavy cleaning (dusting/mopping/vacuuming) of the entire house including portions where the patient never frequented; taking patients' family members to appointments; shopping for the entire household; making beds for everyone in the household; taking out the entire household's trash; and feeding/cleaning up after the household pets.  *Id.* at *14.  However, the living situation experienced by Anglin was such that her patients lived in their own homes (and also lived with their elderly parents), so Anglin ended up doing work for more than just her patients in a home which was not her own.  *Id.*  The obvious and important difference between *Anglin* and the case at bar is that **each of the instant Plaintiffs lived in their own homes; they did not provide care or perform general household duties within a home that was not theirs.**  Hence, the Plaintiffs are attempting to qualify time spent cleaning their own homes as non-exempt and requiring overtime pay, even though they would have cleaned the home whether or not they were employed by Bost.  Bost simply did not hire RHAs to clean their own homes.

Therefore, it is woefully illogical and transparently disingenuous for plaintiffs to contend they spent over twenty percent of their time accomplishing "general household" work in order to

qualify for the exception to the exemption because they lived in their own homes[3].  In other words, any "general household" work they accomplished was work they would have done anyway (for their own benefit) regardless of the companionship care relationship in which they were involved, simply by virtue of the fact they lived in their own homes.  To claim this exception applies, plaintiffs must take the troubling position that they spent so much time cleaning their own homes that they were obviously not acting as companions to their disabled clients (and subject to the Companionship Exemption), but were merely housekeepers . . . of their own homes.  To find the exception applies would encourage RHAs in similar living situations to spend all their time cleaning their own homes (thus neglecting companionship care to disabled clients) in order to claim the Companionship Exemption does not apply.  The "general household" exception collapses under its own weight given the facts surrounding the living situations at bar and is completely inapplicable to this analysis.

Regardless, Plaintiffs have not pled the exception applies and their testimony is insufficient to show the exception would apply even if the general household duties were not accomplished in their homes.  As the non-moving party, Fed. R. Civ. P. 56(e) requires Plaintiffs to set forth specific facts showing there is a genuine issue for trial, and in this case (as will be discussed below), Plaintiffs' have not presented specific facts sufficient to support any argument that they spent twenty percent of their time doing general housework.  *See Toth v. Green River Regional Mental Health/Mental Retardation Board, Inc.*, 753 F. Supp. 216, 217 (W.D. Ky. 1989) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)).  Plaintiffs' deposition testimony is replete with vague and ambiguous responses claiming that they could not estimate or state the

---

[3]  Plaintiffs have not pled any such thing in their Second Amended and Substituted Complaint, *e.g.* that they engaged in general household work in excess of twenty percent of their time (Doc. No. 90).  Also, the deadline to amend pleadings has passed.  (Second Final Scheduling Order; Doc. No. 93, ¶ 4).

amount of time they spent on general housework, regardless of the fact any such housework would have been accomplished in their own homes.

As applied to each Plaintiff in this case, the undisputed facts prove that Plaintiffs were domestic services employees providing companionship services to clients in or about a private home, and the general household duties exception is inapplicable in each scenario.  Accordingly, the Companionship Exemption applies in full, and Plaintiffs are not entitled to hourly and overtime pay[4].

Each Plaintiff, client, and living situation will be discussed in turn.

### III.  Private Home Living Situations

### A.  Janet Cummings

When Cummings first went to work for Bost in 2000, she worked as a "floater" and would travel to various clients' homes to render care.  (Ex. "1", J. Cummings Depo., pp. 129, 133).  After working as a floater, Cummings wanted more hours, more consistency, and a more permanent work arrangement with a client.  (Ex. "1", J. Cummings Depo. pp. 142 – 43).  Eventually, Cummings heard about a client, J.C., with whom she could work more hours and enjoy a more stable work environment than she could by being a floater. (Ex. "1", J. Cummings Depo., p. 143).  J.C.'s parents (who were also his guardians) wanted J.C. to move out of their home, so J.C.'s parents interviewed Cummings to determine whether they wanted Cummings to live with and work with J.C.  (Ex. "1", J. Cummings Depo., pp. 148 – 49).  Once Cummings and J.C.'s parents agreed to let J.C. live with Cummings, she began house hunting.  (Ex. "1", J.

---

[4] Likewise, in accordance with Section 11-4-203 of the Arkansas Minimum Wage Act ("AMWA"), employees employed on a casual basis in domestic service employment to provide companionship services for individuals who are unable to care for themselves because of age or infirmity are expressly **excluded** from the definition of an "employee," thus no claims could arise under that statute.  *See*  Ark. Code Ann. § 11-4-203(3)(O)(ii).

Cummings Depo., p. 165).  Prior to caring for J.C., Cummings lived in a two-bedroom home with her father for whom she also provided care due to his prior head trauma.  (Ex. "1", J. Cummings Depo., pp. 119, 165).  In order for Cummings, her father, and J.C. to all have their own rooms, Cummings rented the home at 8322 Huntington Trace, Fort Smith, Arkansas.  (Ex. "1", J. Cummings Depo., pp. 166 – 68).  Cummings executed a lease with the landlord of Huntington Trace that expressly noted the premises were to be occupied by two adults and one child; Cummings, her father, and J.C.  (Ex. "1", J. Cummings Depo, p. 185; Ex. "2", Cummings' lease dated 5/30/09.  Cummings chose the home because it was easily accessible for J.C.'s wheelchair.  (Ex. "1", J. Cummings Depo., p. 187).  Cummings readily admitted that she would not have rented the home if it were not for J.C. (Ex. "1", J. Cummings Depo., p. 185).

The home at Huntington Trace at which Cummings rendered care to J.C. was not owned by Bost.  (Ex. "1", J. Cummings Depo., p. 196).  Bost was not a party to the lease between Cummings and the owner of the home which contemplated J.C.'s residence at the home.  (Ex. "1", J. Cummings Depo., p. 196).  Bost did not pay any of the rent for the home.  (Ex. "1", J. Cummings Depo., p. 197).  No Bost employees had keys to the home, nor were they allowed into the home without the permission of Cummings.  (Ex. "1", J. Cummings Depo., p. 197).  J.C.'s parents – not Bost – were responsible for making "rents and fees" payments to Cummings. (Ex. "1", J. Cummings Depo., p. 199).  Bost did not pay for any utilities at Huntington Trace; did not provide linens or clothes for J.C.; and did not provide food for J.C. at the home.  (Ex. "1", J. Cummings Depo., p. 203).

Cummings eventually left Bost and went to work for United Cerebral Palsy of Arkansas, Inc. ("UCP"), and when that occurred, J.C. remained in the home at Huntington Trace . . . . Bost could not force J.C. to move out.  (Ex. "1", J. Cummings Depo., p. 203).  Cummings

admitted that the home at Huntington Trace was not open to the public, was a private residence, and was the home at which J.C. lived.  (Ex. "1", J. Cummings Depo., p. 204).  Bost did not maintain any office equipment, e.g. computers, telephones, file cabinets, office supplies, etc.; at the Huntington Trace home.  (Ex. "1", J. Cummings Depo., p. 205).  J.C. lived in the home for six years, and during that time, he always had his own room . . . Cummings treated the home as if it were J.C.'s home.  (Ex. "1", J. Cummings Depo., p. 280).

Cummings admitted that the services she provided to J.C. were "companionship services" in that, according to her discovery responses, she only claims overtime for rendering "companionship services."  (Ex. "3", J. Cummings Discovery Responses, Int. No. 9).   Also, Cummings testified that she spent roughly 1.5 hours per day cleaning for J.C., or 10.5 hours per week.   (Ex. "1", J. Cummings Depo., p. 263).   Even assuming all of the work was "general household" work subject to the twenty percent exception, in her revised damages calculations, she claimed a minimum of 46.25 hours of overtime per week (92.5 hours per two week timeframe ÷ 2 = 46.25). (Ex. "4", J. Cummings Revised Damages Calculations).  As such, it is undisputed that Cummings did not spend over 20 percent of her time on general housekeeping duties [10.5 housekeeping hours ÷  86.25 weekly hours (40 regular hours + 46.25 OT hours) =  .12 or 12%].

Ultimately, it is undisputed that Bost did not own the private home at which Cummings provided exempt companionship care to J.C.  Bost simply did not exert any control over the home in any form or fashion.  The work Cummings accomplished for J.C. while he lived in a private residence was exempt from the overtime requirements of the FLSA.   Any general household work Cummings performed was for her own benefit; therefore, the exception to the exemption is inapplicable.  Her claims should be dismissed with prejudice.

**B.  Emelia Martinez**

Emelia Martinez ("Martinez") lives at 219 North 51st Street in Fort Smith, Arkansas. (Ex. "5", E. Martinez Depo., p. 34). Martinez allowed Bost client, C.A., to live at her home. (Ex. "5", E. Martinez Depo., p. 31, 33). Emelia's husband also lived there while she provided companionship services to C.A. (Ex. "5", E. Martinez Depo., p. 33).

Martinez first began providing services to C.A. when C.A. lived in a group home in Van Buren, Arkansas. (Ex. "5", E. Martinez Depo., p. 105). Martinez would pick C.A. up at life skills in Fort Smith then take C.A. to Martinez's home in Fort Smith to rest, and sometimes for dinner. (Ex. "5", E. Martinez Depo., pp. 126 – 31). Eventually, C.A. moved in with Martinez, an arrangement which was more convenient for Martinez. (Ex. "5", E. Martinez Depo., p. 134).

Bost did not own the home at 219 North 51st Street. (Ex. "5", E. Martinez Depo., p. 34). No Bost employee had a key to the home, and if any Bost employee visited, they had to request permission to do so. (Ex. "5", E. Martinez Depo., p. 34). Bost did not pay for the mortgage, utilities, or maintenance of the home. (Ex. "5", E. Martinez Depo., pp. 34 – 35). Bost did not provide any of the client's food, clothing, or linens. (Ex. "5", E. Martinez Depo., pp. 34 – 35). The main purpose of the home was to provide a living location for Martinez and her family. (Ex. "5", E. Martinez Depo., p. 36). Bost did not maintain any office equipment, computers, fax machines, etc. at the home. (Ex. "5", E. Martinez Depo., p. 36).

It is undisputed that the services Martinez provided to C.A. were companionship services. (Ex. "6", E. Martinez Discovery Responses, Int. No. 9). Also, Martinez could not testify to the amount of time it took her to clean C.A.'s room/bathroom on a daily basis, therefore, she could not prove that over twenty percent (20%) of her time was spent on general housekeeping duties (even though specifically cleaning for some of C.A.'s messes and spills would not be considered general household duties anyway). (Ex. "5", E. Martinez Depo., pp. 155 – 62). Martinez

admitted that her main job was not to be C.A.'s housekeeper.  (Ex. "5", E. Martinez Depo., p. 160).  Regardless, the home was not owned by Bost – it was owned by the Martinez's – and so Martinez would have cleaned the home regardless of whether C.A. lived there or not.  In fact, Martinez cleaned most of the home when C.A. was away at the day program.  (Exhibit "5", E. Martinez Depo., pp. 159 – 60).  As such, the housekeeping exception to the companionship exemption does not apply, and Martinez's claims should be dismissed with prejudice as Bost did not exert any control over the home at issue . . .  it was (and is) a private home.

**C.  Laurel Ringuis**

Laurel Ringuis ("Ringuis") provided services to Bost client, C.H., from 2005 until May of 2015.  (Ex. "7", L. Ringuis Depo., p. 115).  Ringuis testified that C.H. was "like a son" to her and was part of her family.  (Ex. "7", L. Ringuis Depo., p 65).  Ringuis loved C.H. like a member of her family and still talks to him 2 – 3 times a week, even though she is no longer his caregiver.  (Ex. "7", L. Ringuis Depo., p. 237).  Ringuis's son, Mark, and C.H. were "great friends."  (Ex. "7", L. Ringuis Depo., p. 236).

From 2005 to 2015, C.H. lived in various private homes with Ringuis, and the arrangement was mutually agreed upon between Ringuis and C.H.  (Ex. "7", L. Ringuis Depo., p. 115; 214).  C.H. lived with Ringuis and her son at homes on 21st Street, 6th Street, 4th Street and then on Castlewood Avenue, all in Fort Smith, Arkansas.  (Ex. "7", L. Ringuis Depo., p. 110; 115).  C.H.  received his mail at all of those addresses when living there, and he "moved" with Ringuis to each new home.  (Ex. "7", L. Ringuis Depo., pp. 95 – 103; 109 – 115).  At each of the homes, C.H. had his own room, bed, recliner, television, clothes and desk.  (Ex. "7", L. Ringuis Depo., pp. 95 – 103; 109 – 115).  Several of the homes had modifications made to accommodate C.H.  (Ex. "7", L. Ringui Depo., pp. 96 – 97, 102).  C.H. owned his own van and kept it at the

house; Ringuis and her son could use it with permission, even if C.H. was not a passenger. (Ex. "7", L. Ringuis Depo., pp. 85 – 90).

At the home at 903 Southwest Castlewood Avenue, C.H. paid $330.00 in rent, an amount set by Ringuis, which was roughly 1/3 of the mortgage, insurance and property taxes on the home. (Ex. "7", L. Ringuis Depo., pp. 89, 120, 182). For the last couple of years, C.H. also paid $70.00 per month for food. (Ex. "7", L. Ringuis Depo., p. 183 – 84). C.H. and Ringuis arranged for the rent money to be automatically deposited into Ringuis' account. (Ex. "7", L. Ringuis Depo., pp. 181 – 82). C.H. also had a dog and cat that lived at the house. (Ex. "7", L. Ringuis Depo., p. 185). C.H.'s parents visited him at the Castlewood address, and C.H. was also allowed to have friends over as the home was treated as his very own. (Ex. "7", L. Ringuis Depo., pp. 152 –53; 178). There were times that C.H. was at the home alone and times when he was there with Ringuis' son while Ringuis was on vacation. (Ex. "7", L. Ringuis Depo., pp. 62 – 63; 103; 108- 109; 126). Other RHAs would come to take care of C.H. at the Castlewood home when Ringuis was on vacation. (Ex. "7", L. Ringuis Depo., pp. 62 – 63). Ringuis readily admitted that the home at 903 Castlewood was C.H.'s house. (Ex. "7", L. Ringuis Depo., p. 126).

Bost did not own the home at 903 Castlewood. (Ex. "7", L. Ringuis Depo., p. 116). Ringuis purchased the home, because she wanted to be a homeowner. (Ex. "7", L. Ringuis Depo., p. 116). Bost employees could not enter the home without permission, and they did not have a key to the home. (Ex. "7", L. Ringuis Depo., p. 118). Bost did not pay for any utilities, maintain the residence, or provide linens or food for C.H. at the home. (Ex. "7", L. Ringuis Depo., pp. 120 – 121). Nor did Bost keep any office equipment such as computers, telephones, file cabinets or other supplies at the home. (Ex. "7", L. Ringuis Depo., p. 122).

It is undisputed that the services Ringuis provided to C.H. were companionship services. (Ex. "8", L. Ringuis Discovery Responses, Int. No. 9; Ex. "7", L. Ringuis Depo., p. 167). Ringuis was unable to articulate how much time she spent cleaning, therefore, she cannot prove she spent over twenty percent (20%) of her time performing housekeeping duties. (Ex. "7", L. Ringuis Depo., pp. 170 – 73). Ringuis acknowledged that she did not spend over two (2) hours per day cleaning C.H.'s room. (Ex. "7", L. Ringuis Depo., p. 170). In her revised damages calculations, for the vast majority of weeks, Ringuis claimed she was owed a minimum overtime of 47 hours per week (94 hours per two week timeframe ÷ 2 = 47 hours). (Ex. "9", L. Ringuis Revised Damages Calculations). As such, even if one assumes that all cleaning was "general household" work (which it obviously was not), it is undisputed that Ringuis did not spend over 20 percent of her time on general housekeeping duties [less than 14 hours housekeeping hours ÷ 87 weekly hours (40 regular hours + 47 OT hours) = .16 or 16%]. Regardless, the home Ringuis cleaned was her own, and she would have spent time cleaning it anyway, whether she had a client or not. The housekeeping exception to the companionship exemption simply does not apply to these situations.

It is beyond dispute that the homes in which C.H. resided with Ringuis and her son were C.H.'s private homes. C.H. was free to live there just like a son, and Bost did not control the living space in the slightest. Ringuis' claims for overtime should be dismissed with prejudice as the companionship exemption clearly applied to the living situation.

### D.  Victor Pierini

Victor Pierini ("Pierini") lives at 1672 Jack Creek Road, Booneville, Arkansas with his wife Gatha Pierini and R.C., a Bost consumer. (Ex. "10", V. Pierini Depo. vol. 1, pp. 7-8, 42). Pierini provides residential habilitation care for R.C. (Ex. "10", V. Pierini Depo. vol. 1, pp. 111-

12).  Pierini and R.C. have been together since Pierini started working for Bost in 2005.  (Ex. "10", V. Pierini Depo. vol. 1, p. 39, 43).  Initially, Pierini would work with R.C. at a house R.C. rented from Pierini's sister, Tina Slavey.  (Ex. "10", V. Pierini Depo. vol. 1, pp. 8-9, 130).  R.C. moved in with Pierini after the rental house burned.  (Ex. "10", V. Pierini Depo. vol. 1, pp. 45, 130).  R.C. first moved in with Pierini in approximately 2009.  (Ex. "11", V. Pierini Depo. vol. 2, pp. 47-48).  R.C. has lived with Pierini at the current residence on Jack Creek Road in Booneville since late 2010 or early 2011.  (Ex. "10", V. Pierini Depo. vol. 1, p. 117; Ex. "11" , V. Pierini Depo. vol. 2, p. 34).  Ultimately, Rita Didion, who is R.C.'s aunt and guardian, was responsible for the decision to move R.C. in with Pierini.  (Ex. "11", V. Pierini Depo. vol. 2, p. 34).  The arrangement benefited R.C. because it was less expensive for R.C. to live with Pierini; the arrangement also works well for Pierini.  (Ex. "11", V. Pierini Depo. vol. 2, pp. 34-35).  R.C. calls Pierini "Dad," and he calls Gatha Pierini "Mom."  (Ex. "10", V. Pierini Depo. vol. 1, pp. 70-71).  Pierini treats R.C. as family.  (Ex. "10", V. Pierini Depo. vol. 1, p. 71).  Pierini testified that it is R.C.'s choice as to who serves as R.C.'s rehabilitation aid, and R.C. obviously chooses Pierini.  (Ex. "11", V. Pierini Depo. vol. 2, pp. 50).

R.C. has his own bedroom and bathroom, which also serves as a guest bathroom.  (Ex. "11", V. Pierini Depo. vol. 2, p. 12, 14).  Some of R.C.'s other possessions at the home include a TV, a stereo, CD's and DVD's, a chest of drawers, a dresser, nightstand, lamps, clothes, hats, toys, a coffee cup collection, a saddle, a horse, and his dog.  (Ex. "12", G. Pierini Depo., p. 12-13).  The Pierinis and R.C. are the only ones who have keys to the house on Jack Creek Road; Bost does not have a key to the house.  (Ex. "11", V. Pierini Depo. vol. 2, p. 51).

According to Pierini, R.C. is high functioning but "mentally retarded …and [has] an impulse disorder, aggressive behavioral disorder."  (Ex. "10", V. Pierini Depo. vol. 1, p. 47).  R.C.

can read to a limited extent and makes decisions on the food he eats.   (Ex. "12", G. Pierini Depo., pp. 95-96).  R.C. takes care of his own hygiene and helps clean up around the house.  (Ex. "12", G. Pierini Depo., pp. 92-93).   To be specific, R.C. purchases his own personal hygiene items, laundry detergent and other personal items such as coffee.  (Ex. "12", G. Pierini Depo., pp. 107).   R.C. rides horses and owns his own horse, which R.C. purchased along with the necessary tack. (Ex. "10", V. Pierini Depo. vol. 1, pp. 60-61).   R.C. pays the vet bills for the horse.   In addition, R.C. cares for his pet dog, Booboo. (Ex. "10", V. Pierini Depo. vol. 1, pp. 61-62).  The Pierinis provide the feed, and R.C. will feed his horse along with those belonging to the Pierini's since they are providing the feed.     (Ex. "12", G. Pierini Depo., p. 14.  At times, R.C. goes on outings by himself, such as dinner at a friend's house or to church. (Ex. "10" , V. Pierini Depo. vol. 1, pp. 121, 137).  R.C. will grocery shop with Gatha Pierini, and R.C. will select the food he wants.  (Ex. "10", V. Pierini Depo. vol. 1, p. 132).  In addition, R.C. occasionally is allowed to shoot firearms. (Ex. "10", V. Pierini Depo. vol. 1, p. 73).  R.C. would also at times help out at the family's secondhand store called "Cowboys and Angels," and at other times, R.C. would help out selling merchandise for Pierini at the gun shows they would attend.  (Ex.  "10", V. Pierini Depo. vol. 1, p. 152-54).  On a typical day, R.C. would help around the shop, take care of the horses, help run errands, watch TV, make phone calls, play with his pets, get ready for bed, and sleep. (Ex.  "10", V. Pierini Depo. vol. 1, pp. 140-41).  Pierini testified that R.C. would at times stay home from school because "you can't force anyone to do anything they don't want to do." (Ex. "10", V. Pierini Depo. vol. 1, p. 141; Ex. "11", V. Pierini Depo. vol. 2, p. 36).  There have been times when R.C. is left alone at the house, and he is allowed to roam the 80 acre property unsupervised.  (Ex."12", G. Pierini Depo., pp. 35, 93-94).   Gatha Pierini further testified that

"R.C. is capable of doing things on his own by himself, and he has, in fact, lived by himself." (Ex. "12", G. Pierini Depo., p. 89).

R.C. receives Social Security money as well as wages from his job at the Logan County Daycare/Learning Center. (Ex. "10", V. Pierini Depo. vol. 1, pp. 48-49). Bost distributes R.C.'s Social Security money for R.C.'s debts and will also disburse spending money to Pierini for R.C. to use; R.C. cashes his paycheck from the Learning Center and spends it any way he likes. (Ex. "10", V. Pierini Depo. vol. 1, pp. 48-49). Pierini receives $450 per month from R.C.'s Social Security to cover R.C.'s expenses, room and board; Pierini receives an additional amount to cover R.C.'s groceries. (Ex. "10", V. Pierini Depo. vol. 1, pp. 50-51, 65-66). Bost handled R.C.'s expenses and rent when R.C. lived on his own, and according to Pierini, Bost continues to handle the expenses the same way since R.C. moved in with Pierini. (Ex. "11", V. Pierini Depo. vol. 2, p. 35, 93).

R.C.'s guardian (his aunt Rita Didion) does not control any of R.C.'s money, and R.C. has never lived with Rita. (Ex. "10", V. Pierini Depo. vol. 1, pp. 51-52, 136). R.C. has at times visited his aunt Rita on Thanksgiving and Christmas, but R.C. never spends the night there. (Ex. "10", V. Pierini Depo. vol. 1, pp. 135-36). R.C. always returns to the home on Jack Creek Road where he spends most of the holidays. (Ex. "10", V. Pierini Depo. vol. 1, pp. 135-36). Pierini discussed his lawsuit with Rita, and they specifically discussed what would happen to R.C. if Pierini and Bost parted ways…It was Pierini's opinion that he "wouldn't change anything" with respect to R.C.'s care. (Ex. "10", V. Pierini Depo. vol. 1, p. 169). Pierini testified that he would probably take care of R.C. for nothing if he had to. (Ex. "11", V. Pierini Depo. vol. 2, pp. 91).

Bost has no ownership interest in Pierini's home; Bost does not have a key to the home; and Bost has no responsibility for the payment of any bills at the home. (Ex. "10", V. Pierini

Depo. vol. 1, pp. 98-99, 135).  Bost has no contractual rights to Pierini's home, no obligation to perform maintenance on Pierini's home, and "no control over [Pierini's] residence whatsoever…."  (Ex. "10", V. Pierini Depo. vol. 1, p. 177).

During the two deposition settings with Pierini, he was asked to identify the damages he is claiming, but he has no idea what damages he is owed, if any. (Ex. "10" , V. Pierini Depo. vol. 1, pp. 101, 176; Ex. "11", V. Pierini Depo. vol. 2, pp. 30-32).  Pierini had no understanding of the spreadsheet calculation of his purported damages as prepared by his attorneys; he did not know how the spreadsheet was calculated and could not say if it was right or wrong.  (Ex. "11", V. Pierini Depo. vol. 2, pp. 32-33).  Nevertheless, Pierini claims that he is entitled to be paid for hours when he was not with R.C. like those instances when R.C. was off by himself, as well as those times when he and R.C. are both sleeping and when Pierini is napping. (Ex. "10", V. Pierini Depo. vol. 1, pp. 123-24, 143).  Pierini also believes that he is entitled to be paid for those times when he is attending to his own personal needs and not supervising R.C..  (Ex. "10", V. Pierini Depo. vol. 1, p. 124).  Moreover, Pierini admitted that he at times turned in time sheets for work that he did not perform; rather, he would have his relatives babysit R.C. while Pierini was off gambling at casinos.  (Ex. "11", V. Pierini Depo. vol. 2, pp. 67-77).  Although, Pierini cannot say how many hours he worked with R.C. on the days Pierini went to casinos, Pierini contends he is entitled to be compensated for hours he was gambling and not working with R.C..  (Ex. "11", V. Pierini Depo. vol. 2, pp. 74, 84).

Pierini described nothing in his two deposition settings to demonstrate bad faith on the part of Bost; he was not upset with any of his supervisors.  (Ex. "10", V. Pierini Depo. vol. 1, p. 170).  Pierini knows that his pay is funded through Medicaid and that his per diem day rate is intended to cover potentially more than 40 hours per week.  (Ex. "11", V. Pierini Depo. vol. 2,

pp. 42-43).  Even Gatha Pierini admits that "if you're going to break it down into hours instead of a per diem, no, I would not think he would be authorized for the time—to be paid for the time he was not with R.C.."   (Ex. "12", G. Pierini Depo., p. 62-63).

It is crystal clear that R.C. lives in a private home setting.  As discussed in the cases summarized above, mere ownership does not determine whether a house is a Bost consumer's "private home."  Even though R.C.  does not own the Pierinis' home, he lived there just as any child would live at a parent's home.  Although the Pierinis are not R.C.'s biological parents, they have assumed the role of parents—R.C. calls them "Mom" and "Dad", and Pierini testified that he would care for R.C. for nothing if he had to.  Pierini confirmed throughout his depositions that the home was a private home and not one that was maintained or owned by Bost.  He acknowledged that Bost had no key to the house; that no one outside of the family is allowed to use the house; that the bills are paid privately and not by Bost; and that Bost bears no responsibility for the maintenance on the home.  Hence, Bost does not provide Pierini and R.C. a facility in which to live.  Furthermore, R.C. has his own room with his own possessions at the home, which include a horse and a dog.  The only reasonable conclusion is that the home where R.C. resides is a private home, and in fact is his private home.  There are numerous examples in the deposition testimony of R.C.'s capacity to make decisions for himself, and it is clear that he chooses to live with Pierini in a private home setting.

Since it is clear that R.C.'s home was in fact a "private home," the next inquiry is whether the services provided by Pierini were of a companionship nature:   Although Pierini takes issue with the term "companion," Pierini admits that he was and is providing "companionship services" to R.C. by being with him, making sure R.C. is safe, and covering R.C.'s plan goals.  (Ex. "10", V. Pierini Depo. vol.1, p. 112).   This means that Pierini and R.C. "sit and watch TV a lot."  (Ex.

"10", V. Pierini Depo. vol.1, p. 102).   Pierini makes sure that R.C. goes to his counseling meetings and provides a role model of how R.C. is supposed to act—"we don't cuss.  We don't get mad." (Ex. "10", V. Pierini Depo. vol.1, p. 126).   Pierini will speak to R.C. like an adult and counsel him about right and wrong to calm R.C.   (Ex. "10", V. Pierini Depo. vol.1, p. 126). Pierini also helps R.C. choose the right foods to eat.  (Ex. "10", V. Pierini Depo. vol.1, pp. 127-28).  Pierini assists R.C. with community interaction by transporting R.C. to various activities and counseling R.C. to keep R.C. from "getting angry and quitting his job and throwing stuff at his teachers."  (Ex. "10", V. Pierini Depo. vol.1, pp. 128-29).  Next, Pierini assists R.C. with learning to do his own laundry by establishing a routine for laundry on a weekly basis, which R.C. performs with Gatha.  (Ex. "10", V. Pierini Depo. vol.1, p. 131).  The final goal in R.C.'s plan is for R.C. to maintain his safety awareness skills.  Pierini works on this goal by having monthly fire and tornado drills in which R.C. will identify where he is supposed to go.  (Ex. "10", V. Pierini Depo. vol.1, p. 132).   As described above, Pierini's time sheets are filled with examples of Pierini and R.C. spending time together working around the shop, watching TV and listening to the radio, running errands, working at Cowboys and Angels, attending gun shows, and generally working on the plan goals.  Is notable that Pierini describes no times in which he is required to assist R.C. with activities of daily living, perhaps because R.C. has a high level of independence. It cannot be reasonably disputed that the services provided by Pierini are companionship in nature.

The next inquiry is whether Pierini's general household duties for Bost were in excess of the 20% of his total weekly hours worked for Bost.  Pierini has no idea how much time he spends doing household chores; he could not say that he spent as much as 20% of his time working on household chores.  (Ex. "10", V. Pierini Depo. vol. 1, pp. 131).  Pierini cannot quantify on any

given day how much time he spends working on goals and objectives with R.C. or even mere companionship with R.C.. (Ex. "10", V. Pierini Depo. vol. 1, pp. 177). As such, it is undisputed that there is insufficient evidence, beyond speculation, to show that Pierini worked 20% on household chores.

If there ever was a classic example of when the companionship exemption should apply, Pierini's situation is it. R.C. pays for room, board and groceries, and he has all of his possessions at the Pierini's house, which is private and not controlled in any way by Bost. R.C. has lived with no one else since 2009, and the decision to live with Pierini ultimately rests with R.C. and his guardian, not Bost. The exemption has clear application. Pierini's wage and hour claim should be dismissed, and summary judgment should be entered.

## IV. Alternatively, Bost is Entitled to Summary Judgment on the Statute of Limitation and any Claim for Liquidated Damages

### A. Two-Year Applicable Statute of Limitation

The Fair Labor Standards Act's statute of limitations is two years, but the limitations period may be extended to three years if the violation was "willful." 29 USC § 255 (a). The United States Supreme Court has observed that a violation is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S. Ct. 1677, 1681, 100 L. Ed. 2d 115 (1988); *Jarrett v. ERC Props.*, 211 F.3d 1078 (8th Cir. 2000); *Brown v. L & P Indus.*, 2005 U.S. Dist. LEXIS 39920 (E.D. Ark. 2005). "This standard requires more than mere negligence or a good-faith but erroneous assumption that a pay plan complied with the FLSA." *Brown v. L & P Indus.*, 2005 U.S. Dist. LEXIS 39920 (E.D. Ark. 2005). In an FLSA collective action, the action is commenced when a party files his or her written consent to become part of the action. 29

U.S.C.S. § 256(b); *Redman v. United States W. Bus. Res.,* 153 F.3d 691 (8th Cir. 1998).  *See also Reedy v. Tock-Tenn Services,* 2009 U.S. Dist. Lexis 55463 (E.D. Ark. 2009)(granting summary judgment on 2-year statute of limitations).

There is no evidence that Bost willfully violated the FLSA through its application of the companionship exemption.  In fact, the Eighth Circuit recently held that these exact living scenarios were covered by the Companionship Exemption, thus Bost's past practices have been expressly condoned and held to be lawful.  *See Fezard, et al v. United Cerebral Palsy of Central Arkansas,* 2016 U.S. App. LEXIS 27 (8th Cir. 2016).

Another significant fact that demonstrates "good faith" and the absence of any willful violation comes from the Department of Labor itself.  On October 1, 2013, the Department of Labor adopted a final rule that broadens the application of the FLSA and restricts the use of the companionship exemption.[5]   The Department of Labor specifically said "the Department is revising the definition of 'companionship services' to clarify and narrow the duties that fall within the term; <u>in addition third party employers, such as home care agencies, will not be able to claim either of the exemptions.</u> The major effect of this Final Rule is that more domestic service workers will be protected by the FLSA's minimum wage, overtime, and recordkeeping

---

[5]   That Regulation is summarized as follows:

> In 1974, Congress extended the protections of the Fair Labor Standards Act (FLSA or the Act) to "domestic service" employees, but it exempted from the Act's minimum wage and overtime provisions domestic service employees who provide "companionship services" to elderly people or people with illnesses, injuries, or disabilities who require assistance in caring for themselves, and it exempted from the Act's overtime provision domestic service employees who reside in the household in which they provide services. This Final Rule revises the Department's 1975 regulations implementing these amendments to the Act to better reflect Congressional intent given the changes to the home care industry and workforce since that time. Most significantly, the Department is revising the definition of "companionship services" to clarify and narrow the duties that fall within the term; in addition third party employers, such as home care agencies, will not be able to claim either of the exemptions. The major effect of this Final Rule is that more domestic service workers will be protected by the FLSA's minimum wage, overtime, and recordkeeping provisions. 78 Fed. Reg. 60,454.

provisions." 78 Fed. Reg. 60,454.  The regulation was set to become effective January 1, 2015, but was stymied by *Home Care Association of America, et al v. Weil*, No. 15-5108 (D.C. Cir. Oct. 13, 2015).  The implication from this new regulation is that organizations such as Bost could lawfully utilize the companionship exemption up to January 1, 2015, (and then through November 12, 2015) even under the Department of Labor's interpretation of the FLSA.[6]

Here, there is absolutely no evidence of a willful intent to violate the FLSA.  Rather, the proof uniformly shows that Bost acted in good faith.  In the absence of proof of willfulness, Bost is entitled to summary judgment on the statute of limitations, and any claims beyond the applicable two-year period are time-barred.

## B.  Plaintiffs are Not Entitled to Liquidated Damages

Liquidated damages are recoverable under the FLSA in an amount equal to actual damages. See 29 U.S.C. § 216(b).  "In 1947, the statute was amended to provide that the court in its discretion may award no liquidated damages or reduced liquidated damages 'if the employer shows to the satisfaction of the court that the act or omission giving rise to FLSA liability was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the FLSA." *Jarrett v. ERC Props.*, 211 F.3d 1078, 1083 (8th Cir. Ark. 2000) (*citing* 29 U.S.C. § 260).  An award of liquidated damages is mandatory unless the employer can show good faith and reasonable grounds for believing that it was not in violation of the FLSA." Id., (*quoting Braswell v. City of El Dorado*, 187 F.3d 954, 957 (8th Cir. 1999).

---

[6]   Bost does not concede that 78 Fed. Reg. 60,454 correctly applies the intent of Congress.  To the contrary, Bost contends that the DOL exceeded its authority because its interpretation is not based on a permissible interpretation of the FLSA.  *See Ragsdale v. Wolverine Worldwide, Inc.,* 218 F.3d 933 (8th Cir. Ark. 2000); *affirmed, Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 122 S. Ct. 1155, 152 L. Ed. 2d 167, 2002 U.S. LEXIS 1936 (2002).

Here, Bost correctly applied the companionship exemption to the living situations at hand.  Now, the Department of Labor has changed its position on the companionship exemption, resulting in a drastic limitation to the exemption's application.  The regulation now directly restricts the application of the companionship exemption. 78 Fed. Reg. 60,454.  The wording of that regulation and the Eighth Circuit's ruling in *Fezard v. UCP* clearly indicate that Bost's interpretation was proper until the new regulation became effective on November 12, 2015, at which time Bost began paying all of its employees on an hourly, not a *per diem*, basis.

Bost has met its "affirmative burden to show both subjective good faith and objective reasonable grounds for belief of compliance." *McKee v. Bi-State Dev. Agency*, 801 F.2d 1014, 1020 (8th Cir. 1986); *Jarrett v. ERC Props.*, 211 F.3d 1078 (8th Cir. 2000).  As a result, Bost is entitled to summary judgment on any claim for liquidated damages.

## V.  Conclusion

In this case, the Companionship Exemption affirmatively applies to each and every Plaintiff, and their claims should be dismissed with prejudice.  The undisputed facts prove Plaintiffs provided companionship services in or about a private home, and the general household work exception simply does not apply.  Notwithstanding that Plaintiffs' claims should be dismissed with prejudice on the merits, the undisputed evidence shows that Bost did not violate the FLSA, much less willfully violate it.  Bost's use of the Companionship Exemption in these living situations has now been expressly authorized by the Eighth Circuit.  Although none of Plaintiffs' claims should remain intact, even if they were, they would be relegated to a two-year look back period without the possibility of liquidated damages.

Respectfully submitted,

 /s/  S. Brent Wakefield          AR BIN 99144
 /s/  James D. Robertson          AR BIN 95181
BARBER LAW FIRM PLLC
Attorneys for Defendant
3400 Simmons Tower, 425 West Capitol Avenue
Little Rock, AR  72201
(501) 372-6175
E-Mail:  brent.wakefield@barberlawfirm.com
E-Mail: jrobertson@barberlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

Josh Sanford
josh@sanfordlawfirm.com

Steve Rauls
steve@sanfordlawfirm.com

  /s/ S. Brent Wakefield
AR Bar Number 99144
  /s/ James D. Robertson
AR Bar Number 95181
Attorneys for Defendant
BARBER LAW FIRM PLLC
3400 Simmons Tower, 425 West Capitol Avenue
Little Rock, AR 72201-3414
Telephone: (501) 372-6175 / Fax: (501) 375-2802
E-mail: brent.wakefield@barberlawfirm.com
E-Mail: jrobertson@barberlawfirm.com